[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-17439
Non-Argument Calendar
_____

D.C. Docket No. 1:95-cr-00361-DTKH-3


UNITED STATES OF AMERICA,

                                                        Plaintiff-Appellee,

versus

JORGE CHAVEZ,

                                                        Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(October 16. 2017)

Before HULL, MARCUS and MARTIN, Circuit Judges.

PER CURIAM:

After pleading guilty, Jorge Chavez appeals his 121-month sentence for conspiracy to import cocaine, in violation of 21 U.S.C. § 963.  On appeal, Chavez argues that his sentence is procedurally unreasonable because the district court considered hearsay evidence at sentencing and denied Chavez's request for credit for time he served in a Peruvian jail while awaiting extradition.  After review, we affirm.

## I.  BACKGROUND FACTS

In May 1995, Chavez was involved in a scheme to import cocaine from Peru into the United States using a tropical fish importation business.  Pursuant to a plea agreement, in August 1995, Chavez pled guilty to one count of conspiracy to import cocaine.  Chavez agreed to cooperate with the government, including testifying in judicial proceedings and working in an undercover role.  To that end, Chavez was released on bond, and his sentencing was postponed several times.

Chavez's sentencing hearing finally was set for April 1996, but on that date Chavez did not appear.  The district court issued a warrant for Chavez's arrest and, in 1997, declared Chavez a fugitive.

In the meantime, Chavez, while a fugitive, was charged with drug trafficking in Peru at some point in 1997 or 1998.  He remained in jail in Peru until 2002, when he was given "semi-release," which Chavez described as similar to probation.  A month or two later, on July 20, 2002, Chavez was re-arrested by

Interpol and detained on "a federal hold" because the United States had submitted its extradition request. In 2005, while in jail in Peru, Chavez was charged with, and convicted of, a separate drug trafficking offense in a Peruvian court and received an eleven-year sentence. Chavez said he remained in jail in Peru from July 20, 2002 to November 4, 2015, when he was extradited to the United States.

As already mentioned, the United States submitted a request to the Peruvian government to extradite Chavez from Peru in 2002. Although Peru granted the request, execution was postponed while Chavez served his second criminal sentence in Peru for drug trafficking.

In November 2016, more than twenty years after he pled guilty, Chavez was sentenced for his federal cocaine importation conspiracy offense. At the sentencing hearing, the parties disputed, inter alia, whether the district court should apply a two-level enhancement, pursuant to U.S.S.G. § 3C1.1, for willful obstruction of justice because Chavez had fled the United States before his originally scheduled April 1996 sentencing. Chavez testified that he failed to appear in 1996 because he was kidnapped by Peruvian officials, taken back to Peru, and incarcerated.

The government, over Chavez's hearsay objection, submitted a sworn statement from a now-retired Federal Bureau of Investigation ("FBI") case agent, who averred that Chavez's cooperation with federal investigators before his April

3

1996 sentencing hearing was fruitless. The district court discredited Chavez's kidnapping story, found that Chavez willingly left the United States, and overruled Chavez's objection to the obstruction-of-justice enhancement.

The district court calculated an advisory guidelines range of 121 to 151 months' imprisonment. After denying Chavez's request for credit for time served in the Peruvian jail and considering the 18 U.S.C. § 3553(a) sentencing factors, the district court imposed a 121-month sentence.

## II.  DISCUSSION

In reviewing a sentence for procedural reasonableness, this Court considers whether the district court committed any significant procedural error, such as miscalculating the advisory guidelines range, treated the guidelines as mandatory, failed to consider the 18 U.S.C. § 3553(a) factors, selected a sentence based on clearly erroneous facts, or failed to explain adequately the chosen sentence. See United States v. Cubero, 754 F.3d 888, 892 (11th Cir. 2014).[1]

### A.    District Court's Obstruction-of-Justice Ruling

---

[1]In his opening brief, Chavez states in the heading for his first issue that his sentence is both procedurally and substantively unreasonable, but makes no argument as to substantive reasonableness. Thus, we do not address that issue on appeal. See Sapuppo v. Allstate Floridian. Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014) (explaining that a party abandons an issue on appeal by making only a passing reference to it); United States v. Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003). ("Under our caselaw, a party seeking to raise a claim or issue on appeal must plainly and prominently so indicate. Otherwise, the issue—even if properly preserved at trial—will be considered abandoned.").

Prior to Chavez's 2016 sentencing, the probation office prepared a presentence investigation report ("PSI") that, among other things, recommended applying a two-level increase in Chavez's offense level, pursuant to U.S.S.G. § 3C1.1, for willfully obstructing or impeding the administration of justice. The PSI stated that Chavez "obstructed the administration of justice by failing to appear for sentencing in 1995 and leaving the United States" and noted that Chavez had "been a fugitive until his arrest in Peru in November 2015."[2] Chavez objected to the obstruction-of-justice enhancement, claiming that he was unable to attend the 1996 sentencing because Peruvian officials had forcibly taken him back to Peru, where he was arrested and incarcerated.

The government filed a response and sentencing memorandum arguing that Chavez had offered no proof that he was unwillingly removed from the United States in 1996 and was not credible. The government attached (1) copies of Peruvian documents relating to Chavez's extradition; and (2) an affidavit from retired FBI agent Scott Wiegmann, the case agent who investigated Chavez's drug trafficking activities. In his affidavit, Wiegmann stated that he had refreshed his recollection by reviewing documents provided by the prosecutor. Wiegmann averred that after agreeing to postpone Chavez's sentencing several times and

---

[2]The PSI erroneously stated that Chavez's original sentencing hearing was in 1995. In December 1995, the district court granted Chavez's second motion to continue the sentencing hearing and re-set Chavez's sentencing hearing for April 12, 1996.

5

meeting with Chavez on numerous occasions to debrief him, Chavez's cooperation was not fruitful, and his sentencing was set for April 12, 1996. Wiegmann stated that he was "confident" that Chavez's cooperation "did not result in any arrests, seizures, indictments, or convictions."

At his 2016 sentencing hearing, Chavez testified that while on bond, he worked with FBI and Drug Enforcement Agency ("DEA") agents to help arrest and prosecute various drug dealers. Before his sentencing hearing, however, Peruvian officials, working with a DEA agent, kidnapped him and forcibly returned him to Peru.

After Chavez began to elaborate upon his cooperation with various federal investigations, the following exchange between the court and defense counsel occurred:

> **THE COURT:**    Can I make a suggestion?  I don't - - this is really not helpful to me to hear about all of these other things.  What I really need to know is whether the - - I need to know the dates and factual statement about what Mr. Chavez is contending.
>
> In other words, if he is contending that he literally was taken from the United States prior to the date of his sentencing.  I think that has to be established.  I think it's admissible that he may have been trying to help the Government and probably enter a 5K1 for himself or something else, but I'm afraid that gets us into a tangent that really isn't helpful today.  I need to know was he taken out of the United States.
>
> **MR. RODRIGUEZ:**    I will certainly address that, but I want the Court to realize that the only reason this is being brought to your attention is not for purposes of a 5K or a Rule 35, it's to show that he had every anticipation and every expectation of receiving a benefit here, and why would he return to Peru.

6

**THE COURT:**    I understand that.  I understand all of that.  But I think the factual issue that we have got to deal with is, is it true that he was literally taken out of the United States and, thereby, was not able to come to the sentencing.

Defense counsel stated he understood.

As to his failure to appear for sentencing in 1996, Chavez testified that about four or five months before his 1996 sentencing hearing, two Peruvian police officers and a United States DEA agent (with whom Chavez said he had previously worked in Peru) grabbed him as he parked his car at his home.  Chavez claimed the officers tricked him by telling him he "was under arrest for a warrant in Peru," but he later learned there was no arrest warrant and he had been kidnapped.  The three officers took Chavez to the Miami airport and escorted him on a commercial flight to Peru.  Chavez said the officers purchased the airline tickets at the airport, and he was able to board the plane without a passport or any other documentation.  Once in Peru, Chavez said he was immediately arrested for drug trafficking and taken to jail.  Chavez believed he was kidnapped because he had told DEA agents based in Peru that he "couldn't cooperate with them any further" because other DEA agents based in the United States had advised him to concentrate on solving his own problems and cooperate with them instead.

In response, the government argued that Chavez was not credible for two reasons.  First, the government contended that Chavez's testimony was internally inconsistent and had "a lot of holes," and that his claim that Peruvian officers

would "conduct essentially an extraordinary rendition" and that a DEA agent would risk his career to help, "defies common sense and reason."

Second, the government offered retired agent Wiegmann's sworn statement to refute Chavez's claim that he had no motivation to flee because he expected to receive a sentence reduction for his cooperation. Chavez objected to the statement "as hearsay," but did not elaborate. The district court stated that reliable hearsay is admissible at sentencing and determined that Wiegmann's "sworn and notarized statement" was reliable as "testimony offered under oath." After reading the statement, the district court stated that "all Agent Wiegmann says is Mr. Chavez really never produced anything that they thought was useful. So he doesn't speak at all to the issue of the alleged kidnapping." The district court admitted the statement over Chavez's objection.

After hearing argument from the parties, the district court stressed that "the question is what really happened here." The district court found Chavez's testimony "just simply to be preposterous and not credible," noting that there were established extradition procedures and that the "notion that three people show up in the dead of night and literally kidnap Mr. Chavez is really fairly extraordinary. I don't think that it's credible and worthy of belief." The district court pointed out that Chavez already gave testimony (on another objection) that contradicted the un-objected to facts in the PSI, "shaving the truth." The district court stated that

8

Chavez's story was not impossible, but "it's so out of the realm of what - - how governments conduct themselves and how matters like this are handled, that I simply find that it's not credible and worthy of belief.  For that reason, I'm going to overrule the defendant's objection to the two-level enhancement for obstruction of justice."  The district court found that Chavez chose to exit the United States prior to the 1996 sentencing when he realized that he would not get a reduction for cooperation.  The district court stated, "the nub of the issue of what he's talking about is 'I wasn't present at sentencing because I was literally taken from the United States' I find not to be credible and worthy of belief. And so I reject that testimony."

## B.    Chavez's Hearsay Claim

In determining whether factors exist to support a sentencing enhancement, the sentencing court may consider any information, including hearsay, regardless of its admissibility at trial, "provided that the evidence has sufficient indicia of reliability, the court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence."  United States v. Ghertler, 605 F.3d 1256, 1269 (11th Cir. 2010); see also 18 U.S.C. § 3661; U.S.S.G. § 6A1.3(a) ("[T]he court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

"A defendant has a due process right, however, not to be sentenced based on false or unreliable information." Ghertler, 605 F.3d at 1269. "To prevail on a challenge to a sentence based on the consideration of such information, a defendant must show (1) that the challenged evidence is materially false or unreliable and (2) that it actually served as the basis for the sentence." Id. The defendant bears the burden of showing that the district court explicitly relied on the information. Id.

On appeal, Chavez concedes that a district court may consider reliable hearsay evidence at sentencing. Instead, Chavez argues that: (1) Federal Rule of Evidence 807 required the government to give him notice of its intent to rely on the hearsay evidence; (2) former agent Wiegmann's statement lacked sufficient indicia of reliability; and (3) the district court failed to make explicit findings as to Wiegmann's credibility.

At sentencing, Chavez's only objection to Wiegmann's statement was on hearsay grounds. Chavez did not object to the lack of notice under Rule 807 or to the sufficiency of the district court's credibility finding. Accordingly, we review these issues only for plain error. See United States v. Chau, 426 F.3d 1318, 1321-22 (11th Cir. 2005).

As to the lack of notice, Chavez cannot show error, much less plain error. First, the Federal Rules of Evidence do not apply to sentencing proceedings. See Fed. R. Evid. 1101(d)(3). Therefore, the government was not required to provide

10

the notice required by Rule 807.  Second, the government attached a copy of Wiegmann's statement to its sentencing memorandum filed prior to the sentencing hearing.  Thus, Chavez cannot argue that he was unaware of Wiegmann's statement and the government's reliance upon it to undermine Chavez's claim that he had no reason to flee because he expected a government motion for a sentence reduction based on his substantial assistance.

As for the reliability of Wiegmann's claim that Chavez's cooperation was fruitless, Wiegmann's statement, as the district court noted, was sworn before a notary.  Furthermore, Wiegmann was the FBI case agent who investigated Chavez, and Wiegmann met with Chavez numerous times after his guilty plea in an effort to obtain useful information from him.  Thus, Wiegmann was speaking of events about which he had personal knowledge.  Although Wiegmann was describing events that occurred twenty years earlier, Wiegmann averred that he had refreshed his recollection by reviewing materials provided by the prosecutor, and Wiegmann stated that he was confident of his recollection that Chavez's cooperation did not result in any arrests, seizures, indictments, or convictions.

Moreover, while Chavez was not able to cross-examine Wiegmann, he did have an opportunity to rebut Wiegmann's claims at the sentencing hearing with his

11

own evidence.[3]  In fact, Chavez took the stand and contradicted Wiegmann, testifying, among other things, that in various criminal cases his cooperation led to the arrest of 13 individuals, the seizure of drugs and four airplanes, and his testifying before a judge against a member of the Medellin drug cartel.  The problem for Chavez is that the district court wholly discredited Chavez's testimony, and Chavez did not present any other evidence to suggest that Wiegmann's statement about Chavez's fruitless cooperation was either false or unreliable.  Indeed, Chavez has never offered any reason why Wiegmann, a retired FBI agent, would lie under oath about the results of Chavez's cooperation.[4]

As for the district court's failure to make explicit findings about Wiegmann's credibility, the district court appears to have implicitly credited Wiegmann's statement.  Specifically, the district court stated "What happened in this case, in my view and the evidence points to it, is that Mr. Chavez simply exited the United States and was not present at the sentencing and that was a result of a willful decision on his part that he saw that the 5K1 effort was not going to be successful and he then took matters into his own hands."  In any event, a district

---

[3]This Court has concluded that the Sixth Amendment right of confrontation does not extend to non-capital sentencing proceedings.  See United States v. Cantellano, 430 F.3d 1142, 1146 (11th Cir. 2005).

[4]Notably, the prosecutor advised the district court that he had asked the former prosecutor assigned to Chavez's case in 1995 to give an assessment of Chavez's cooperation so that the current prosecutor could file a 5K motion, but he was told that Chavez provided "a lot of hearsay, a lot of information from other sources, but not his own."  The current prosecutor said he could not find anything to corroborate Chavez's claims about his cooperation.

12

court's failure to make the credibility finding explicit "'does not necessarily require reversal or remand where the reliability of the statements is apparent from the record.'" United States v. Docampo, 573 F.3d 1091, 1098 (11th Cir. 2009). As already discussed, Wiegmann's statement had sufficient indicia of reliability. More importantly, however, Chavez cites no authority demonstrating plain error in these circumstances.[5]

In sum, given that Wiegmann's statement contained sufficient indicia of reliability and that Chavez was aware of, and had an opportunity to rebut Wiegmann's statement with his own evidence, the district court did not err in admitting it at the sentencing hearing.

## C.    Denial of Credit for Time Served in Peru

At sentencing, the district court declined Chavez's request to give him credit for the "more than 13 years" he spent in jail in Peru after the U.S. extradition request. The district court concluded that it lacked authority to grant Chavez's request and that "it needs to be handled at another time in another forum."

The Attorney General through the Bureau of Prisons ("BOP"), not the district courts, is authorized under 18 U.S.C. § 3585(b) to compute sentence credit

---

[5]We recognize that a defendant has a due process right "not to be sentenced based on false or unreliable information." See Ghertler, 605 F.3d at 1269. Chavez, however, does not now (and never has) raised a due process claim based on the district court's reliance on Wiegmann's statement. Chavez's brief on appeal does not mention the words due process. Thus, he has abandoned this issue. See Jernigan, 341 F.3d at 1283 n.8.

awards after sentencing.  Dawson v. Scott, 50 F.3d 884, 889 (11th Cir. 1995).  The Attorney General delegated his authority in this area to the BOP.  United States v. Lucas, 898 F.2d 1554, 1555-56 (11th Cir. 1990).  This Court has held that "the granting of credit for time served is in the first instance an administrative, not a judicial, function."  United States v. Flanagan, 868 F.2d 1544, 1546 (11th Cir. 1989).  The district court, therefore, cannot circumvent the Attorney General's initial discretion concerning whether to credit a defendant's time in custody prior to sentencing.  Lucas, 898 F.2d at 1555.

Chavez attempts to distinguish this binding precedent by arguing that his request for time-served credit from 2002 to 2015 is based on an extradition treaty between the United States and Peru.  Chavez contends that under this extradition treaty, the United States must give him credit for his detention in Peru while awaiting extradition.  Chavez ignores that from 2005 to 2015, by his own admission, he was serving jail time on his second Peruvian drug trafficking sentence.  In any event, Chavez provides no authority for his claim that despite 18 U.S.C. § 3585(b), "a district court must still consider the impact of a treaty which addresses this matter."  Nothing in the treaty, which Chavez attached to his sentencing memorandum, suggests it was intended to supersede § 3585(b).  We conclude that Chavez must first present his request to the BOP and exhaust his

14

administrative remedies before that agency before seeking judicial review.  <u>See</u>

<u>Lucas</u>, 898 F.2d at 1555.

Accordingly, the district court did not err in concluding it lacked authority to

give Chavez credit for time served in Peru.

## II.  CONCLUSION

For these reasons, we conclude that Chavez has not shown that his sentence

is procedurally unreasonable.  Accordingly, we affirm Chavez's 121-month

sentence.

**AFFIRMED.**

15